FILED

12/23/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 9, 2024

## ASHLEY LENAL CROWDER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2018-B-953    Cynthia Chappell, Judge**

_____

**No. M2024-00119-CCA-R3-PC**

_____

The Petitioner, Ashley Lenal Crowder, appeals the denial of her petition for post-conviction relief from her guilty-pleaded convictions for second degree murder, aggravated child neglect and attempted aggravated child neglect, arguing that she was denied the effective assistance of trial counsel and that her guilty pleas were unknowing and involuntary. Based on our review, we affirm the judgment of the post-conviction court denying the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT W. WEDEMEYER, J., joined.

Paul Marsh, Nashville, Tennessee, for the appellant, Ashley Lenal Crowder.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On May 1, 2018, the Davidson County Grand Jury returned an eight-count indictment against the Petitioner that charged her with two counts of the first degree felony murder of her eleven-month-old son, R.K.H., Jr.[1], during the perpetration of or attempt to

_____

[1] It is the policy of this court to refer to minor victims by their initials.

perpetrate aggravated child abuse/aggravated child neglect, one count of the aggravated child abuse of R.K.H., Jr., one count of the aggravated child neglect of R.K.H. Jr., one count of the attempted aggravated child neglect of R.H., who was R.K.H., Jr.'s twin sister, and three counts of the child abuse of R.K.H, Jr.'s three other siblings, all of whom were under the age of eight.

On September 13, 2021, the Petitioner pled guilty to the lesser-included offense of second degree murder in count two and to the indicted offenses of aggravated child neglect in count four and attempted aggravated child neglect in count five in exchange for an out-of-range sentence of thirty years at 100% for the second degree murder conviction, an out-of-range sentence of thirty years at 100% for the aggravated child neglect conviction, and a Range I sentence of ten years at 30% for the attempted aggravated child neglect conviction, with the sentences to be served concurrently, for a total effective sentence of thirty years at 100% in the Tennessee Department of Correction. Pursuant to the terms of her negotiated plea agreement, the remaining counts of the indictment were dismissed.

At the guilty plea hearing, the prosecutor provided a lengthy recitation of the facts on which the State would have relied had the case proceeded to trial. The prosecutor stated that the State's proof as to Counts 2 and 4, would have been

> that on Friday July 28[] of 2017[,] a little bit before 4:00 p.m., [the Petitioner] carried her eleven-month-old son, [R.K.H., Jr.], into the emergency department at Centennial Hospital. She was driven to the hospital by her friend, Demetra Hall. Her other children were in the car with her. [The Petitioner] had five children at the time. Her eleven-month-old son [R.K.H., Jr.] was a twin to [R.H.]
>
> When [the Petitioner] carried her infant son into the emergency room, he was in full cardiac arrest. He was not breathing. And while the doctors worked on him for almost two hours, he never actually took another breath. Dr. Tyler Berutti, who was an ICU doctor working at Centennial Medical Center that day, he treated [R.K.H., Jr.]. And he described his injuries . . . as an abdominal catastrophe.
>
> He would have explained that [R.K.H., Jr.] suffered from a bow[e]l perforation that could only have been caused from blunt force injury, that this bow[e]l perforation . . . occurred sometime prior to this day. It would have taken many hours, even days for [R.K.H., Jr.]'s stomach to get in this condition. Dr. Berutti would have described that his stomach was completely distended and it was full of free air. He would have explained that that is not

- 2 -

something that should ever happen to a human much less an eleven-month-old.

And because his stomach was so distended, they . . . had to cut an incision in his stomach to relieve that pressure. Dr. Berutti would have described that, when they made that incision . . . a large amount of tan foul smelling fluid came pouring out of his stomach. He would have described that that was fecal matter that was inside of [R.K.H., Jr.]'s body. Dr. Berutti would have described that he has never, in his practice as a physician, seen anything like the abdominal catastrophe that [R.K.H., Jr.] suffered.

He also would have described that there were additional injuries that were indicative of abuse, that there was a healing posterior right eighth rib fracture. There was a large burn that was in some state of healing to his right leg. There were multiple other bruises and contusions including a frenulum injury to his upper frenulum. He had a healing scab on the top of his nose, but also in that top lip in . . . his frenulum. He additionally had an injury to the palm of his hand.

Dr. Berutti would have testified that the totality of all these injuries and the state of that abdominal injury and that bow[e]l perforation, that that was all signs that were indicative of abuse. Dr. Berutti would have also testified that a bow[e]l perforation and the sepsis that it caused that led to [R.K.H., Jr.]'s death on that day is one hundred percent treatable. If [R.K.H., Jr.] had been brought to the hospital earlier, they absolutely could have treated that condition.

They could have fixed that injury. They could have fixed the sepsis that had just been toxifying his entire body for days. They could have fixed it, and he would not have died that day. However, it moved into his blood stream and it was too progressed because, again, he showed up at the hospital in full cardiac arrest.

According to the prosecutor's recitation of facts, additional evidence that the State would have introduced included the Petitioner's statements to law enforcement that the only time her children were in the care of anyone other than herself for the week preceding R.K.H., Jr.'s Friday death was on Monday, when she left R.K.H., Jr. for two hours with her sister, Stanmisha Crowder. Ms. Stanmisha Crowder and the friend with whom she was staying, Tyrika Haynes, would both have testified that it was immediately obvious that there was something wrong with R.K.H., Jr. Ms. Stanmisha Crowder would have additionally testified that she took the child to the home of another sister, April Crowder,

and both Ms. Stanmisha Crowder and Ms. April Crowder would have testified that they told the Petitioner they thought she needed to take the child to a doctor. The Petitioner reported that the child's father visited with the child for a few minutes on Friday morning, but the State's expert witnesses would have testified that it was not possible that the abdominal injury occurred that morning.

The State would have additionally presented photographs and videos of R.K.H., Jr., including a July 24 video taken by the Petitioner in which R.K.H., Jr. has no obvious injuries to his face but there appears to be something wrong with him, a July 26 photograph in which R.K.H., Jr. is in a carrier with his head slumped over and very serious injuries to the top of his nose and to his upper lip, and a July 28 video taken by Demetra Hall as she waited in her vehicle with the Petitioner's children at an apartment complex while the Petitioner was inside filling out an application. The prosecutor stated that in that video, which shows a green substance coming out of R.H.K. Jr.'s mouth and nose, Ms. Hall expresses concern for R.H.K., Jr.'s welfare and tells the Petitioner to come back to the vehicle. Had the case gone to trial, the State would have also introduced the Petitioner's text response to Ms. Hall, "[H]ere I come, yeah, he been doing that."

The prosecutor recited the following facts on which the State would have relied for Count Five, the attempted aggravated child abuse of R.H.

> As to Count 5, the State's proof would be that, between December 21[], 2016 and July 28[], 2017, [the Petitioner's] child [R.H.] - - on that December 21[] 2016, [R.H.] was taken to the hospital because she was having seizures. During the investigation into [R.K.H., Jr.]'s death, the subject of [R.H.]'s injuries from that December 21[], 2016 date came up in the interview with Detective Kenney.
>
> [The Petitioner] made statements to Detective Kenney that she left [R.H.], who was four months old at the time, in her crib. There were witnesses that stated that [the Petitioner] had said that she left her in her crib with a bottle, that she left her to deal with [R.K.H., Jr.] because [R.H.K., Jr.], her twin, was crying, that he did this often. There are witnesses that would say that it was reported that a blanket was also left over her head, but [the Petitioner] admitted to Detective Kenney that she did not know how long she left her daughter in that bed, but it could take a while to get [R.K.H., Jr.] situated because he cried so often.
>
> And she said that [R.H.] must have thrown up and it got into her lungs, and that she was having seizures and she has no idea how long she would have been left alone in that room having seizures, but that her brain had lost

- 4 -

oxygen. That incident caused [R.H.] to suffer with serious physical disabilities. She became special needs. She required a feeding tube and several medications.

The State's proof would also be that [R.H.], during that time from December when this injury occurred until July when [R.H.K., Jr.] passed away, that she missed twenty-two appointments for physical and occupational therapy, that she was not taking [R.H.] in for the treatment that was required. And she . . . got discharged from both of those programs.

On January 31, 2022, the trial court denied the Petitioner's "Motion for Withdrawal of Guilty Plea and Sentence Reduction" on the basis that the motion for withdrawal of guilty plea was untimely and the Petitioner failed to state any grounds in support of her motion for sentence reduction.

On March 29, 2022, the Petitioner filed a pro se petition for post-conviction relief in which she raised several claims, including ineffective assistance of trial counsel, unknowing and involuntary guilty pleas, and actual innocence. Following the appointment of post-conviction counsel, she filed an amended petition in which she alleged that trial counsel was ineffective for, among other things, not properly investigating the facts of her case, not investigating her mental health history or requesting a mental evaluation, and not fully explaining the plea agreement to her. The Petitioner alleged that her guilty pleas were unknowing and involuntary due to trial counsel's deficiencies in representation and due to trial counsel's having pressured her into accepting the plea agreement.

At the August 23, 2023 evidentiary hearing, the Petitioner testified that she pled guilty on Monday, September 13, 2021, but signed the plea agreement on Friday, September 10. She said the trial was scheduled for that Monday, and that she texted trial counsel on September 9 to ask when they were going "to prep for the trial." Trial counsel told her to meet him at 3:00 p.m. on September 10 in the investigator's office. When she arrived, trial counsel, who had his laptop open, told her that the prosecutor had found out about the Petitioner's Williamson County charges, which the Petitioner had been "fighting . . . for months[,]" and which trial counsel had said the prosecutor would not learn about. At the September 10 meeting, trial counsel not only told her that the prosecutor had learned of the Willamson County charges, but also said that the prosecutor would use them against her at trial. Trial counsel also told her that the prosecutor "was going to give [the Petitioner] life without parole[,]" but with the plea agreement, the Petitioner would have a chance at parole.

The Petitioner testified that she signed the plea agreement because she thought she had no choice. She did not read the agreement and could not recall trial counsel's ever

- 5 -

explaining it to her prior to her signing it. She stated that trial counsel was insistent that she sign the agreement, telling her that it was the only way she would have any chance at parole:

> I don't remember him telling me anything. I just signed it because it's getting life without parole or having a chance at parole. So I just signed it. I didn't read nothing. I just signed it. . . . .
>
> And he made sure that I didn't leave without signing that paper. He came out and kept checking to make sure that I didn't leave, to make sure I signed that paper. The printer had messed up. She [investigator] had to go . . . all the way across the street to get the papers and come back. And he made sure I stayed there to sign them papers.

The Petitioner testified that she always maintained her innocence and never gave trial counsel any reason to think she was interested in a plea deal. In fact, she declined a plea that had been offered on September 4 because she wanted to go to trial. She testified: "I was so not right about it [accepting the September 10 plea offer]- - because I ain't never - - [trial counsel] knew that I wanted to go to trial. I never gave him no reason to think that I was even going to take a plea deal." The Petitioner repeated that she signed the plea agreement only because trial counsel told her she was going to get life without parole if she went to trial but would have a chance for parole with the plea deal, and that she could not recall trial counsel's reading the plea agreement or explaining it to her. She then indicated that she was too emotionally distraught that day to hear or understand even if trial counsel read the plea agreement to her: "If he did read that plea deal, I - - I was still worked up. I was crying." She was certain that she never held the plea agreement in her hand.

The Petitioner testified that, although she originally thought she had completed the tenth grade, she learned after she went to prison and received her school records that the ninth grade was her highest competed grade. She said she "bounced around a lot" from school to school and was not focused on learning. She stated that in September 2021, she was using Xanax and marijuana daily. She did not think she talked to trial counsel about her drug use. However, one of her Williamson County charges involved the possession of Xanax. The Petitioner testified that when trial counsel talked to her about that Williamson County charge, he did not ask her if she was regularly using that drug or any other drugs.

The Petitioner testified that when she signed the plea agreement on September 10, she thought the case "was over with." She said she used marijuana and Xanax on the day she signed the plea agreement and on September 13, the day she appeared in court. She stated she had used both drugs "the whole week because [she] knew [she] was fixing to go to jail." She described her mental condition on September 10 as "[n]ot right." She testified

that she had been diagnosed with bipolar disorder, generalized anxiety, PTSD and depression and had been prescribed Remeron and Cymbalta. She stated she was not taking her prescription medication regularly and was not using it on the day she signed the plea agreement. She said trial counsel never inquired into her mental condition or asked her about her medications.

The Petitioner testified that two different times during pauses in her plea colloquy she told trial counsel that she wanted to go to trial. Each time trial counsel told her that they would not be able to beat the case due to her Williamson County charges. She said she did not believe she had the option to tell the trial court that she did not want to plead guilty; she thought her appearance in front of the trial court was "was merely a ceremonial act because [her plea] was already done on paper."

On cross-examination, the Petitioner acknowledged that she was originally represented by a public defender, who discussed the case with her. She further acknowledged that she was aware of the State's proof, including the medical testimony that the State was prepared to present. She conceded that the Williamson County charges were based on her violation of her no-contact order by having her children with her in her vehicle, some of whom were unrestrained, and having drugs in her possession. She further conceded that the episode was captured on police body camera. She insisted, however, that she had a valid reason for violating the trial court's order:

> Because I'm innocent. I did not cause the injuries to my son. And there was a reason why I had my kids. My kids right now, currently, are still getting mistreated, blunt force trauma mistreated right now today. And that's part of the reason why I had my kids that day. So yes, I do want a trial.

When asked if she was aware that she could have been convicted even if the jury believed that she was not the one who caused the blunt force injury to her son, if the proof was that she did nothing to protect the child or to get him treatment, she replied in the affirmative but insisted that she still wanted to go to trial. She testified that she had used Xanax and marijuana on a regular basis "for a long time" before she went to jail, but that it did not affect her ability to care for her children because she only used it after the children were "already situate[ed] and settled." She stated that she took her prescription mental health medication when it was available, but that she did not always have access to it. She said she did not inform the trial court that she was on marijuana and Xanax during her plea colloquy because she "was scared to say that [she] was high."

Trial counsel testified that he initially met with the Petitioner on September 10 to prepare for trial, but that they ended up signing the plea agreement that day. He said the Petitioner had called him "some months prior" at the direction of her Williamson County

attorney to tell him that she was in court in Williamson County. During that conversation, the Petitioner explained the situation, which trial counsel described as follows:

> She had been apparently driving over ninety miles an hour on the interstate and gotten pulled over. And she had four children, some of whom weren't hers. I think some were. Some weren't []restrained in the car. When they stopped her, they found various amounts of drugs in her purse. And that was a problem, number one, because we had had a lengthy bond hearing in front of [the trial court] where [the trial court] had prohibited her from having unsupervised visitation with her children number one. And of course, obviously, having drugs is not allowed when you're on bond either.

> The other problem we had was that some of the allegations against her other children were that they had ingested [X]anax. And to that point, we had been able to keep that evidence out of the upcoming trial. But the fact that she was now violating that court order, she was in fact, you know, ostensibly engaging in child neglect by speeding down the highway with unrestrained children in the car while she had drugs, that that evidence may come in. And that obviously concerned me.

Trial counsel testified that the Davidson County prosecutor learned of the Williamson County charges after being contacted by the prosecutor in Williamson County, and that she responded by filing a motion to revoke the Petitioner's bond and a 404(b) motion to introduce the evidence at trial. He said he explained to the Petitioner "that there was a more than decent chance" that the evidence might be considered relevant at her trial, especially if she testified. The Petitioner asked what her options were, and he responded that she could either seek a plea or "go to trial under these facts." He then reached out to the prosecutor, who "conveyed the offer that [the Petitioner] ultimately pled to."

Trial counsel testified that he reviewed the plea agreement with the Petitioner, going over it with her line by line to ensure that she understood it. He said the State requested that the Petitioner sign the plea agreement that day so that they could stop their intense weekend trial preparation and call off the witnesses "with some assurance that [the Petitioner] was serious about taking this agreement." The Petitioner signed the agreement sometime late in the afternoon and then left. He thought they had three or four copies of the agreement, and that the Petitioner had her own copy, which she looked at as he sat beside her with his copy and reviewed the agreement with her. He did not know if the Petitioner had her copy of the agreement with her when she left but thought she probably did.

Trial counsel testified that he never told the Petitioner that signing the plea agreement meant "it was a done deal." He instead explained that signing the agreement meant that she understood the plea agreement, understood her rights, and understood that she would be waiving those rights and petitioning the trial court to accept her guilty plea pursuant to the terms in the agreement. He estimated that he spent approximately fifteen to twenty minutes reviewing the agreement with the Petitioner before she signed it.

Trial counsel characterized the Petitioner's "educational capacity" or "ability to understand" as "average." He could not recall having any discussion with the Petitioner about her being able to change her mind about accepting the plea deal because "[i]t never came up." However, he "explain[ed] to her that it's never over until the Judge accepts it and that's that" and asked her on Monday morning before she entered her pleas if she was "still good" with the plea. The Petitioner responded, "[Y]eah" or words to that effect. Trial counsel said he explained the plea colloquy process to the Petitioner and did not know why she believed it was merely a ceremonial process. He recalled that their discussion during a pause in the plea colloquy was occasioned by the Petitioner's becoming upset that the abuse allegations involving her other children were brought up during the State's recitation of facts, when those other cases "had been severed and were not going to be part of the trial."

Trial counsel testified that he had represented the Petitioner for approximately three years before she entered her pleas. He said that the Petitioner never asked him to strike a deal, but she also never said she wanted to go to trial. He stated that "it was pretty much assumed that she was going to go to trial" and most of their discussions revolved around the proof and trying to come up with a defense. It was not until September 10 when "all these other things had come up," that the Petitioner asked about other options. At that point, he stepped out, called the prosecutor, and obtained the last-minute plea bargain. He thought he recalled that they had a "status date" leading up to trial in which the possibility of a plea bargain might have been discussed, but he had no memory of specific offers being made by the State.

Trial counsel testified that the Petitioner never told him that she was using drugs and never appeared high in any of their meetings, and he did not ask her if she was using drugs. He said he and his investigator had many conversations with the Petitioner about her mental health. The Petitioner was "emotional" during some of their meetings, and he was aware that she "had an exceptionally difficult childhood" and was "dealing with a lot of emotional issues based on DCS records and her own self-disclosure." He knew "without a doubt" that the Petitioner suffered from PTSD and knew that she was depressed, although he did not recall her ever saying that she had been diagnosed with bipolar disorder.

Trial counsel acknowledged the Petitioner was in a stressful situation on Friday, September 10, with "some urgency in that [they] need[ed] to finalize the paperwork [that day." He said he would have preferred for the Petitioner to have more time but pointed out that they had all evening if necessary. He stated that his records reflected that they were there for about three and one-half hours that day. He could not recall if he asked the prosecutor for more time for the Petitioner to consider the offer but said that he may have.

Trial counsel testified that the Petitioner "adamantly denied intentionally inflicting injuries on her children." He said that he and the investigator both believed that the child's father had inflicted the injuries and in one of their meetings confronted the Petitioner about it. By the look on the Petitioner's face, trial counsel was convinced that the Petitioner "knew that [trial counsel] knew that he did it." The Petitioner, however, "would not go that route." Trial counsel said that they received the impression from the people they interviewed that "a lot of people were afraid of that man." He stated that the Petitioner's refusal to say that the child's father inflicted the injuries "ultimately . . . came down to . . . if I say that, then the kids won't have anybody."

Trial counsel testified that the Petitioner maintained throughout that she did not abuse her children. He said their defense to the abuse charge was focused on attempting to imply that the child's father did it and to point out that other people were also around the children. Their big problem, however, was coming up with a defense to the neglect charge. He said he explained to the Petitioner that if the jury believed "that [she] neglected the child and the child died from that neglect" she would still get life, even if the jury believed that she was not the one who inflicted the injury. Trial counsel testified that he never said life without parole.

On cross-examination, trial counsel testified that he had been practicing criminal defense since December 1999, with his current practice comprised of one hundred percent criminal defense. During that time, he had worked on thousands of criminal cases, including hundreds of homicide cases. He said he met with the Petitioner multiple times during his representation and never had any concerns that she was intoxicated or impaired or did not understand what was going on. Had the Petitioner exhibited any signs of mental impairment, he would have sought funds for a mental evaluation.

Trial counsel agreed that his reaching out to the prosecutor on September 10 about the possibility of a plea bargain was instigated by the Petitioner's indication that she did not want to go to trial and "face the full punishment." He further agreed that the State never filed a life without parole notice and repeated that he never used the term "life without parole" in his conversations with the Petitioner. He stated that the Petitioner wanted to mitigate her exposure and asked him to contact the prosecutor to attempt to work out a deal. He could not recall that he was the one who came up with the sentence of thirty

years at one hundred percent but acknowledged it was possible. He agreed that the prosecutor made it clear that the Petitioner had to sign the plea agreement that Friday or else go to trial, that he explained everything to the Petitioner, and that the Petitioner "expressed that she understood it[.]" He acknowledged that the Petitioner told the investigators that the child's father had not been around R.K.H., Jr. during the time that the abdominal injury was inflicted but said he thought the Petitioner and some of her other family members lied to investigators due to their fear of the child's father.

On redirect examination, trial counsel testified that he had no formal training in detecting intoxication. On recross examination, he testified that he had represented thousands of criminal defendants, many of whom had drug and alcohol issues. If he noticed any indication of intoxication with any client, he would end the meeting and note it in his file. He had no notations in his file of the Petitioner's appearing impaired in any of their meetings.

On September 13, 2023, the post-conviction court entered an order denying the petition on the basis that the Petitioner failed to meet her burden of showing that trial counsel was ineffective in his representation or that her guilty pleas were not knowing and voluntary. On January 11, 2024, the post-conviction court entered an amended order identical to the September 13, 2023 order except for the correction of minor clerical errors. On January 25, 2024, the Petitioner filed a timely notice of appeal to this court.

## ANALYSIS

The Petitioner contends that the post-conviction court erred in denying her petition, arguing, among other things, that she received ineffective assistance of counsel due to trial counsel's failure to thoroughly investigate the case or to request a mental evaluation, and that her guilty pleas were unknowing and involuntary due to trial counsel's deficiencies in representation, her drug use, and the fact that trial counsel pressured her into accepting the plea deal. She also contends that she is entitled to relief based on her actual innocence of the charges.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of

- 11 -

witnesses or the weight of their testimony. *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citations omitted). However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. *Id.* (first citing *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); and then citing *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013)). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *Id.* at 400 (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (first citing *Strickland*, 466 U.S. at 688; and then citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim"). In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he would not have pled guilty but would instead have insisted on proceeding to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *House v. State*, 44 S.W.3d 508, 516 (Tenn. 2001).

In *Boykin v. Alabama*, 395 U.S. 238, 242 (1969), the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is knowing by questioning the defendant to make sure he or she fully understands the plea and its consequences. *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999); *Blankenship*, 858 S.W.2d at 904. Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. *Blankenship*, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) the defendant's familiarity with criminal proceedings; (3) whether the defendant was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against the defendant and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. *Id.* at 904-05.

In denying the petition, the post-conviction court found that the Petitioner's testimony "d[id] not align with the evidence and was not credible" while trial counsel's testimony was credible. The post-conviction noted, among other things: that the Petitioner did not testify that she disclosed her mental health diagnoses to trial counsel but trial counsel testified that he observed the Petitioner's emotional distress and made efforts to support the Petitioner with her depression; that the Petitioner "offered no testimony to support her assertion that trial counsel failed to explain all possible defenses"; that the Petitioner offered no evidence other than her general statement as to how trial counsel pressured her into accepting the plea agreement; that the Petitioner offered no evidence in support of her allegation that trial counsel misled her; and that trial counsel "testified to having discussed and explained defense strategies, the charges and anticipated proof at trial with the Petitioner." The post-conviction court, therefore, concluded that the Petitioner failed to show by clear and convincing evidence that trial counsel was deficient in his representation or that she was prejudiced as a result of counsel's alleged deficiencies.

With respect to the Petitioner's claim of unknowing and involuntary guilty pleas, the post-conviction court noted that during the plea colloquy, the Petitioner denied that she was taking any medications or was under the influence of alcohol or any other intoxicants, denied that she had a diagnosis of mental illness or any mental disorder, and acknowledged "that there was no reason she would not understand what she was doing." The post-conviction court further noted trial counsel's "credible testimony" that he was aware of the Petitioner's emotional state and encouraged her to seek assistance for depression, but that the Petitioner never revealed any diagnosis of bipolar disorder. The post-conviction court observed that the Petitioner did not present any evidence, other than her own testimony, to corroborate any mental health diagnoses. The post-conviction court concluded, therefore, that the Petitioner failed to prove her allegations of unknowing and involuntary guilty pleas by clear and convincing evidence.

The post-conviction court further concluded that the Petitioner was not entitled to post-conviction relief based on her claim of actual innocence because she failed to provide proof that her claim was based on new scientific evidence.

The record fully supports the findings and conclusions of the post-conviction court. Trial counsel, an experienced criminal defense attorney whose testimony was accredited by the post-conviction court, testified that he investigated the case, met with the Petitioner on multiple occasions, and discussed the State's evidence and their possible defenses. He explained why the Petitioner's Williamson County charges were so detrimental and described the conversation in which the Petitioner authorized him to reach out to the prosecutor to seek a plea bargain. Trial counsel testified that the Petitioner was of average ability, that she never exhibited any signs of intoxication, impairment, or mental illness, and that she appeared to understand the plea agreement.

The transcript of the guilty plea hearing reveals that the trial court conducted a very thorough plea colloquy with the Petitioner. The trial court began by instructing the Petitioner to verbalize clearly her answers to the questions, to speak up when she did not understand so that the trial court could rephrase the question until she understood, and to let the trial court know at any time if she wanted a break to confer with her counsel. The trial court also informed the Petitioner that she had taken an oath to answer the questions truthfully and received her assurance that she understood and realized that she could be prosecuted for perjury for giving untruthful answers to the trial court or the prosecutor.

The Petitioner informed the trial court that she had gone as far as the eleventh grade, that she could read and write, that she was not currently taking any medications, that she had not within the past twenty-four hours consumed alcohol or any other intoxicant, that she had never been diagnosed with any mental illness or disorder, and that there was no reason she could not understand the proceedings. The trial court then reviewed in detail

- 14 -

the charges and potential punishments the Petitioner faced if she went to trial, as well as the offenses and punishments involved in the plea deal, including that the Petitioner was pleading to second degree murder in exchange for a thirty-year sentence, which was more than the Petitioner would receive if convicted of second degree murder at trial. The Petitioner affirmed that she understood the charges and punishments she was facing, that trial counsel had discussed the facts and possible defenses, that she had signed the plea agreement, that she had reviewed the plea agreement before signing it and fully and completely understood it, that trial counsel had answered any questions she had, and that she had no complaints about trial counsel's representation. She further affirmed that no one had threatened or promised her anything and that she was freely, knowingly, and voluntarily entering her pleas because she was guilty.

The post-conviction court's findings and conclusions with respect to the Petitioner's claim of unknowing and involuntary guilty pleas states in pertinent part:

> The record establishes that [the] Petitioner signed a plea petition evidencing her approval of the written plea offer and affirmatively demonstrated to the trial court during the plea colloquy that her plea of guilty was both voluntary and knowledgeable. Th[e P]etitioner negotiated a plea bargain that resulted in lesser charges and a lower sentence than she might have received if convicted. The plea agreement was beneficial to [the] Petitioner in that she pled to the less serious charge of second-degree murder, several counts were dismissed, and all counts run concurrently. From the . . . Petitioner's testimony, it is clear she is not satisfied with her plea agreement now and wants to use the post-conviction process as a vehicle to withdraw her plea, which has already been adjudicated. [The] Petitioner has failed to prove her allegations by clear and convincing evidence and, therefore, [the] Petitioner's Amended Petition for Post-Conviction Relief is respectfully DENIED. .

The record supports the findings and conclusions of the post-conviction court. The Petitioner repeatedly assured the trial court that she understood her plea agreement, that she was not under the influence of any intoxicant or otherwise unable to understand the proceedings, and that she was entering into the agreement knowingly and voluntarily. An admission by the petitioner that he entered his guilty plea voluntarily weighs in favor of finding a voluntary guilty plea. *See Franklin v. State,* No. M2021-00367-CCA-R3-PC, 2022 WL 852909, at *4 (Tenn. Crim. App. Mar. 23, 2022) (affirming finding of a knowing and voluntary guilty plea, in part, when "Petitioner told the court that he understood the plea agreement and the rights he waived by pleading guilty, that he was satisfied with

counsel's performance, and that he was pleading guilty voluntarily."), *no perm. app. filed.* We, therefore, affirm the judgment of the post-conviction court.

## **CONCLUSION**

Based on our review, we conclude that the Petitioner has not met her burden of showing that trial counsel was ineffective or that her guilty pleas were unknowing and involuntary. Accordingly, we affirm the denial of the petition for post-conviction relief.


s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE